ASSOCIATION FOR FAIRNESS IN
  BUSINESS INC., a New Jersey Non-
  Profit Corporation, Plaintiff,

v.

The State of NEW JERSEY, The New
  Jersey Casino Control Commission, a
  Public Body Corporate and Politic of
  the State of New Jersey, John J.,
  Farmer, Jr., Esq., Attorney General of
  the State of New Jersey, and James R.
  Hurley, Chairperson of the New Jer-
  sey Casino Control Commission, De-
  fendants.

Civil Action No. 99–5733.

United States District Court,
D. New Jersey.

Feb. 8, 2000.

**354**

Salvatore Perillo, Perskie, Nehmad & Perillo, P.C., Atlantic City, NJ, for Plaintiff, Ass'n for Fairness In Business Inc.

John J. Farmer, Jr., Attorney General of New Jersey, Mark Turner Holmes, Deputy Attorney General, Trenton, NJ, for Defendants, State of New Jersey and John J. Farmer, Jr., Attorney General of New Jersey.

John R. Zimmerman, General Counsel, New Jersey Casino Control Com'on, David C. Missimer, Assistant General Counsel, Atlantic City, NJ, for Defendants, New Jersey Casino Control Com'n and James R. Hurley, Chairman, New Jersey Casino Control Com'n.

## OPINION

ORLOFSKY, District Judge.

In this case, I am called upon to decide whether the minority "set-aside" provisions of New Jersey's Casino Control Act and the implementing regulations promulgated by the Casino Control Commission are constitutional. However well intentioned the Act and the implementing regulations may be, I conclude that they do not pass constitutional muster under the current jurisprudence of the United States

Supreme Court, and the law of this Circuit. For the reasons that follow, I conclude that they are unconstitutional and that Plaintiff is entitled to a preliminary injunction enjoining Defendants from enforcing the relevant portions of the Act and the regulations adopted to implement them.[1]

## I. Factual and Procedural Background

On December 9, 1999, the Association for Fairness in Business, Inc. ("the Association"), a non-profit corporation whose members contract to provide goods and services to gambling casinos in Atlantic City, New Jersey, filed a Verified Complaint and Demand for Jury Trial against the State of New Jersey, the New Jersey Casino Control Commission, the Attorney General of New Jersey, and the Chairperson of the New Jersey Casino Control Commission. See Verified Compl. & Demand for Jury Trial (filed Dec. 9, 1999). The allegations contained in the Verified Complaint challenge the minority "set-aside" provisions of the New Jersey Casino Control Act and regulations promulgated pursuant to that Act. See id.

Specifically, the Casino Control Act provides that each casino licensee "shall have a goal of expending 15% of the dollar value of its contracts for goods and services with minority and women's business enterprises." N.J.S.A. 5:12–186a; See also N.J.A.C. 19:53–5.3(c). Casino licensees must file reports with the Casino Control Commission describing their efforts to meet this goal, and may risk the imposition of penalties, including the suspension or revocation of their licenses, if the Casino Control Commission determines that they have failed to meet this goal. See N.J.S.A. 5:12–186b, 187.1; N.J.A.C. 19:53–5.7, 5.8, 6.11. The Association alleges that these minority "set-aside" provisions, among others, violate the Fifth and Fourteenth Amendments of the United States Consti-

---

1. The minority "set-aside" provisions of the Act are codified at N.J.S.A. §§ 5:12–184–190. The implementing regulations adopted by the Casino Control Commission may be found at N.J.A.C. §§ 19:53–1.1–6.12.

tution, 42 U.S.C. §§ 1981 and 1983, Article 1, Section 1 of the Constitution of New Jersey, and the New Jersey Law Against Discrimination, N.J.S.A. § 10:5–1, *et seq.* *See* Verified Compl. & Demand for Jury Trial. The Association seeks, among other things, a preliminary injunction enjoining the enforcement of sections 5:12–184 through 5:12–190 of the Casino Control Act and sections 19:53–1.1 through 19:53–6.12 of the regulations implementing the Casino Control Act.

On December 9, 1999, I issued an Order to Show Cause why I should not issue a preliminary injunction against the Defendants pursuant to Federal Rule of Civil Procedure 65. *See* Order to Show Cause (filed Dec. 9, 1999). I have jurisdiction in this case under 28 U.S.C. §§ 1331 and 1367. For the reasons set forth below, I shall grant the Association's application for a preliminary injunction in part and deny it in part. Specifically, I shall preliminarily enjoin the enforcement of N.J.S.A. §§ 5:12–184 through 5:12–190. I shall not enjoin the enforcement of all of the provisions contained in N.J.A.C. 19:53–1.1 through 19:53–6.12, however, because not all of those provisions are exclusively concerned with the implementation of N.J.S.A. 5:12–184 through 5:12–190. Consequently, I shall enjoin the enforcement of those Administrative Code provisions only to the extent that they implement N.J.S.A. 5:12–184 through 5:12–190.

## II. Standing

Although the Association's standing to pursue its claims is not disputed by the Defendants, as a threshold matter I conclude that the Association does have standing to seek injunctive relief on behalf of its members. An association has standing to sue on behalf of its members if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the

claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *see also New York State Club Ass'n v. New York,* 487 U.S. 1, 9, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988) (citing *Hunt,* 432 U.S. at 343, 97 S.Ct. 2434); *Int'l Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. Brock,* 477 U.S. 274, 282, 290, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986) (affirming the *Hunt* framework).

The final two prongs of the *Hunt* test are easily satisfied in this case. First, the Defendants do not dispute that the Association represents "building contractors, subcontractors, suppliers and purveyors of goods and services" or that the Association "exists for the purpose of pursuing fairness, equal opportunity, equity and free and open competition in all matters relating to the provision of goods, services and supplies to governmental entities and regulated industries with specific emphasis on casinos in Atlantic City." Verified Compl. & Demand for Jury Trial ¶ 1. It is clearly germane to the Association's stated purpose of pursuing "equal opportunity" and "free and open competition" to attempt to stop unlawful discrimination against its members in the apportionment of goods and services contracts. Second, the claims brought by the Association raise pure questions of law, most significantly whether the set-aside program in this case is unconstitutional under the Equal Protection Clause of the Fourteenth Amendment.[2] A claim that raises a pure question of law and does not require the presentation of individualized proof of liability or damages is precisely the type of claim that associations such as Plaintiff have standing to pursue. *See Brock,* 477 U.S. at 287–88, 106 S.Ct. 2523.

---

**2.** Moreover, at oral argument counsel for all parties conceded that there are no disputed issues of fact.

■ That being said, it is also true that the Association's members "would otherwise have standing to sue in their own right," *Hunt*, 432 U.S. at 343, 97 S.Ct. 2434, although this prong of the *Hunt* test requires a slightly more extended discussion. The standing requirements of the Constitution mandate that plaintiffs in all cases demonstrate:

> An "injury in fact"—an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; second [that] there [is] a causal connection between the injury and the conduct complained of—the injury has to be "fairly trace[able] to the challenged action of the defendant, and not ... the result [of] the independent action of some third party not before the court." Third, [that] it [is] "likely," as opposed to merely "speculative," that the injury will be redressed by a favorable decision.

*Schurr v. Resorts Int'l Hotel, Inc.,* 196 F.3d 486, 491 (3d Cir.1999) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). In cases where a party seeks forward-looking relief on the ground that a minority "set-aside" program violates the Equal Protection Clause of the Fourteenth Amendment, an "injury in fact" can be demonstrated by showing that the allegedly injured party is unable to compete on an equal footing because of the program, *see Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 211, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (citing *Northeastern Fla. Chapter of the Associated Gen. Contractors of America v. Jacksonville,* 508 U.S. 656, 666, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993)), and that the party is "able and ready to bid on contracts," *Northeastern Fla. Chapter of the Associated Gen. Contractors of America,* 508 U.S. at 666, 113 S.Ct. 2297, "sometime in the relatively near future." *Adarand,* 515 U.S. at 211, 115 S.Ct. 2097.

At least some of the Association's members are capable of demonstrating the "injury in fact" which is necessary to confer standing to sue and which is a prerequisite to the Association's suit on behalf of its members. The Association has submitted the affidavit of Allen A. Zappone ("Zappone"), President of two of the companies the Association represents. Zappone asserts that one of his companies, Pro Construction and Design, Inc. ("Pro"), once served the casino industry as a general contractor, but no longer does so "because of the preferences which the casinos are [are] compelled to give" to minority and women business enterprises. Aff. Supp. Order to Show Cause ¶ 4 (received Dec. 9, 1999). He claims that Pro "was told not to even bother to bid on certain contracts because the work had been set aside" for minority or women business enterprises and that at least one time "Pro was not awarded a contract, even though it was the low bidder" and despite the fact that Pro was the most qualified company to perform the contracted-for work. *Id.* Pro contends that the set-aside program at issue in this case was a "significant influence" in its decision to terminate its general contracting business. *Id.* Zappone's undisputed affidavit provides some evidence that the Association's members are unable to compete for casino industry contracts on an equal footing because of the set-aside program at issue in this case. Even without Zappone's affidavit, it is clear that the set-aside program establishes an unequal playing field in the awarding of contracts by the casino industry. While the regulations governing the set-aside program do not mandate specific contracting decisions, they undoubtedly have a "concrete effect" on whether non-minority business enterprises receive contracts from casino licensees. *Cf. Schurr,* 196 F.3d at 493. The Commission's regulations and the enabling statute authorizing them not only establish "goals" for casino licensees to achieve with regard to hiring minority business enterprises, they also provide for oversight by the Casino Control Commission and empower the Commission to impose penalties, including the revocation and suspension of gaming licenses, upon any casino licensee who fails to make a good faith effort in meeting these goals. Indeed, as the Court

indicated in *Adarand,* an allegation of the equal protection of the laws of the sort involved in this case "of course alleges an invasion of a legally protected interest, and it does so in a manner that is 'particularized' " to the Association's members. *Adarand,* 515 U.S. at 211, 115 S.Ct. 2097.

Moreover, there is sufficient evidence before the Court that the "injury in fact" in this case is "actual and imminent," further supporting the finding that the Association's members would have standing to pursue a preliminary injunction on their own behalf and that, derivatively, the Association has standing. In a Supplemental Certification, Zappone provides evidence that the second of the two companies he heads, Fabi Construction Inc. ("Fabi"), is a repeat player in the casino industry who will bid on casino contracts in the near future. *See* Supplemental Cert. ¶ 2. In this undisputed Supplemental Certification, Zappone indicates that for the past several years Fabi has bid on numerous casino contracts involving virtually all of the casinos in Atlantic City. *See id.* In just the past six months, Fabi has bid on two casino projects subject to the requirements of the set-aside program. *See id.* ¶ 4. Fabi intends to maintain its presence in the casino industry by bidding on "many, if not most" of the future casino construction contracts, including a $700,-000,000 project called the Bogata project. *Id.* ¶ 5. Zappone claims that Fabi, like Pro, has been denied construction contracts despite having the best qualifications and being the lowest bidder for particular projects because the projects were set aside for minority or women business enterprises. *See id.* ¶¶ 2, 4. Zappone has demonstrated through the history of Fabi's participation in the casino industry, Fabi's ongoing activity in Atlantic City, and his sworn statement concerning Fabi's future commitment to seeking contracts from casino licensees that Fabi will actually and imminently experience similar results if the set-aside program continues to operate.

Because the "actual injury" inquiry required of this Court to examine the question of standing is nearly identical to the "irreparable harm" inquiry performed when addressing the merits of a preliminary injunction application, it is worth emphasizing the sufficiency of the evidence the Association has provided regarding the imminency of the harm to be suffered by Fabi and other members of the Association. Specifically, this case is much closer to the Supreme Court's decision in *Adarand,* in which the Court found that a party seeking an injunction on facts not unlike those present here had standing, than the Third Circuit's recent decision in *Schurr,* in which standing was found not to exist. In *Adarand,* the plaintiff challenged a federal program whereby general contractors awarded government construction contracts were given incentives to use subcontractors controlled by "socially and economically disadvantaged" individuals. *See Adarand,* 515 U.S. at 204, 210, 115 S.Ct. 2097. In determining that the plaintiff, Adarand Constructors, Inc. ("Adarand"), had alleged "actual injury" sufficiently for the purposes of establishing standing, the Court relied on evidence of Adarand's past practice of bidding on government contracts in concluding that Adarand would likely bid on such contracts again. *See* id. at 212, 115 S.Ct. 2097. Significantly, the Court relied on deposition testimony not unlike Zappone's Suppplemental Certification in this case in arriving at its conclusion. *See id.* Admittedly, there was stronger documentary evidence in *Adarand* that Adarand would have the opportunity to bid again on government contracts for highway guardrails, the type of construction in which Adarand specialized. Statistical evidence was presented that indicated that between 1983 and 1990 the government awarded contracts of the sort that would affect Adarand at least 1.5 times a year. *See id.* This may be owing to the fact that the District Court decision that ultimately resulted in the Court's *Adarand* opinion was originally decided on a motion for summary judgment, *see id.* at 210, 212, 115 S.Ct. 2097, ostensibly after the parties in that case had an opportunity,

not present to the same degree here, to develop the factual record.

Moreover, the particular circumstances of this case make such evidence unnecessary. The set-aside program at issue in this case concerns all facets of contracting for goods and services in the entire casino industry. The Association is not suing on its own behalf but on the behalf of its members, who bid on the full range of contracts awarded by the casino industry in Atlantic City. Undoubtedly, members of the Association face not only an imminent but an ongoing threat of injury as a result of the set-aside program. At any rate, there is no reason to assume that *Adarand* establishes some minimal threshold for the sufficiency of evidence. It is clear to this Court that Fabi faces "actual and imminent" injury and that, as a result, the Association has standing to sue on its behalf.

Moreover, this case differs significantly from the Third Circuit's decision in *Schurr*. In *Schurr*, the Plaintiff, Karl Schurr ("Schurr"), sought an injunction on the ground that the Casino Control Commission's regulations governing affirmative action in casino industry hiring were unconstitutional. *See Schurr*, 196 F.3d at 488. The Third Circuit held that Schurr did not have standing to pursue his application for an injunction. *See id.* at 495. It arrived at this conclusion in part because evidence had been presented indicating that Schurr had obtained casino industry jobs without adverse consequences in the aftermath of being denied the job that was the source of his Complaint. *See id.* There is no analogous evidence here. Moreover, while the Third Circuit found no evidence in the *Schurr* record regarding the likelihood that Schurr would ever again compete with minorities or women for a job in the casino industry, *see id.*, there is evidence in this case, based upon Zappone's undisputed affidavit and certification and the fact that the Association is suing on behalf of a number of actors over regulations concerning all facets of contracting in the casino industry, that there is a significant likelihood that companies represented by the Association will have to compete with minority and women business enterprises for casino industry contracts. Interestingly, the Third Circuit distinguished *Adarand* from the facts of *Schurr*, *see id.*, for many of the reasons I find *Adarand* to be similar to the case before me. Consequently, I hold that the Association has made a sufficient showing that its members have suffered an "injury in fact" as a result of the set-aside program and that the Association has standing to seek to enjoin the operation of the program on the behalf of its members.

Remarkably, this lengthy discussion does not quite conclude the standing inquiry. In order to find that the Association has standing, I must also find that "there [is] a causal connection between the injury and the conduct complained of" and that it is " 'likely' ... that the injury will be redressed by a favorable decision." *Id.*, 196 F.3d at 491 (quoting *Lujan*, 504 at 560–61, 112 S.Ct. 2130). Fortunately, much of the preceding discussion will allow me to be brief. As already mentioned, the effect of the set-aside program on contracting decisions cannot be doubted. While the statute and the regulations governing the set-aside program do not necessarily mandate particular outcomes in every circumstance, the penalties that may be imposed should casinos not contract with minority and women business enterprises sufficiently under the terms of the program very likely have a "concrete effect" on contracting decisions. The Zappone Affidavit and Certification support this point. Finally, an order enjoining the enforcement of the provisions of the set-aside program will clearly redress the injury suffered by the Association's members in having to compete on the less-than-level playing field fostered by the set-aside program.

### III. The Standard Applicable in Determining Whether a Request for a Preliminary Injunction Should Be Granted

Given that the Association has standing to sue on behalf of its members, I now

turn to the Association's application for a preliminary injunction. The legal standards which govern whether a request for a preliminary injunction should be granted are well-settled in this Court. " 'Four factors govern a [D]istrict [C]ourt's decision whether to issue a preliminary injunction: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the non-moving party; and (4) whether granting the preliminary relief will be in the public interest.' " *Doe v. National Bd. of Med. Examiners*, 199 F.3d 146, 154 (3d Cir. 1999) (quoting *American Civil Liberties Union of New Jersey v. Black Horse Pike Regional Bd. of Educ.*, 84 F.3d 1471, 1477 n. 2 (3d Cir.1996)) (en banc). I will discuss each prong of this standard in turn.

## IV. The Association Has Shown a Reasonable Probability of Success on the Merits

█ The Association has demonstrated a reasonable probability that it will succeed in showing that the set-aside provisions of the Casino Control Act and the regulations promulgated pursuant to that Act are unconstitutional. In *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), the Supreme Court applied strict scrutiny to a minority set-aside program established by the City of Richmond, Virginia, holding that the program violated the Equal Protection Clause of the Fourteenth Amendment. Under the minority set-aside program at issue in that case, construction contractors hired by the City of Richmond were required to subcontract at least thirty-percent of the dollar amount of the contracts they received to minority business enterprises. *See id.* at 477–78, 109 S.Ct. 706. The Court held that Richmond failed to demonstrate a compelling interest in apportioning public contracting opportunities on the basis of race because the city

had not made specific findings of the existence of discrimination in the Richmond construction industry. *See id.* at 505, 109 S.Ct. 706. Moreover, the Court ruled that it was impossible to assess whether Richmond's set-aside program was narrowly tailored to remedy race-based discrimination since it was not linked to identified discrimination in any way. *See id.* at 507, 109 S.Ct. 706.

In this case, the State of New Jersey and the New Jersey Casino Control Commission have not made a showing of discrimination that would support a finding that New Jersey has a compelling interest in applying a set-aside program to contracts for goods and services in the casino industry. First, there is little evidence that the creation of the set-aside program in this case was predicated on findings of race-based or gender-based discrimination in the casino industry. There is no evidence, for example, that the New Jersey Legislature adopted the set-aside program on the basis of any such findings. The New Jersey Legislature merely stated:

> [T]he opportunity for full minority and women's business enterprise participation in the casino industry is essential if social and economic parity is to be obtained by minority and women business persons and if the economy of Atlantic City is to be stimulated as contemplated by the "Casino Control Act."

N.J.S.A. 5:12–184 (citation omitted). Similarly, there is little evidence that the Casino Control Commission relied on particularized findings of discrimination in promulgating the regulations for the set-aside program. While the Casino Control Commission stated in its regulations that "any program designed to improve opportunities for the residents of Atlantic City must of necessity address the need to prevent or eliminate any disadvantage incurred by reason of race or ethnicity," N.J.A.C. 19:53–5.1(c) and that prior to the creation of the set-aside program minority business enterprises had not received contracts from casinos in part because of "racial discrimination," [3] N.J.A.C.

---

3. Interestingly, the Casino Control Commis-

sion makes no reference to gender-based dis-

19:53–5.1(d), these statements are hardly probative of discriminatory practices on the part of casino licensees in contracting for goods and services.

For example, it is not clear whether these statements refer to race-based discrimination in the casino industry specifically or to some more general form of societal discrimination, a clearly impermissible ground for the adoption of a race-based remedy. *See Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 274, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). Even if these statements do refer to race-based discrimination in the casino industry, they are at best conclusory assertions of the type that the Supreme Court has held to be insufficient for the purposes of establishing the existence of discrimination in an industry. *See J.A. Croson Co.*, 488 U.S. at 500–01, 109 S.Ct. 706. Also, these same regulations undermine whatever evidence of prejudice they may provide by identifying race-neutral explanations for why minority business enterprises may lag behind non-minority business enterprises in securing contracts, *see* N.J.A.C. 19:53–5.1(d) (mentioning "difficulties in attracting equity or other capital funds," an "inability to secure bonding," and a "relative lack of experienced minority managerial personnel," among other things); *J.A. Croson Co.*, 488 U.S. at 507, 109 S.Ct. 706 (characterizing such difficulties as race-neutral), and by indicating that for the four years prior to the creation of the set-aside program, casino licensees had voluntarily and in good faith attempted to contract with minority business enterprises for the purchase of fifteen-percent of the goods and services they required. *See* N.J.A.C. 19:53–5.1(d). Indeed, the sheer scope of the set-aside program belies the contention that it has been adopted to combat any particularized race-based or gender-based discrimination. The fact that the New Jersey Legislature and the Casino Control Commission included persons of Hawaiian and native Alaskan decent among the minorities the set-aside program is designed to help, *see*

N.J.S.A. 5:12–185; N.J.A.C. 19:53–1.2 (not including a reference to people of native Alaskan decent), may indicate that racial and ethnic groups were added to the list of the set-aside program's intended beneficiaries without much attention to whether their inclusion was justified by evidence of past or current discrimination. *See J.A. Croson Co.*, 488 U.S. at 506, 109 S.Ct. 706.

This Court certainly has been provided with no evidence that either the New Jersey Legislature or the Casino Control Commission undertook any study that revealed that qualified Hawaiian-owned and native Alaskan-owned contractors even exist in New Jersey, let alone that these minority businesses enterprises are discriminated against by casino licensees in the purchase of goods and services. In short, there is absolutely no indication that the New Jersey Legislature, or the Casino Control Commission relied on any evidence even approaching the level of specificity required by the Court in *J.A. Croson Co.* in deciding to establish the existing set-aside program. Evidence of discrimination in the casino industry cannot be derived from the founding of the program.

Counsel for the State of New Jersey acknowledges that there is no evidence in the language of the Casino Control Act indicating that the set-aside program was predicated on a finding of past discrimination, but cries "foul," arguing that it is unfair to expect that the New Jersey Legislature would have included such language in the statute since *J.A. Croson Co.* was decided four years after the Act was signed into law. *See* Br. Opp'n Pl.'s Application for Temporary Restraining Order or Preliminary Injunction at 15 (dated Jan. 21, 2000). Counsel for the State does not, however, offer any evidence that the New Jersey Legislature actually made, but simply omitted mention of, particularized findings of discrimination in adopting the Casino Control Act. Instead, Counsel for the State refers the Court to the *Final Report of the State of New Jersey Governor's*

crimination in articulating the reasons for the enactment of the set-aside program.

*Study Commission on Discrimination in Public Works Procurement and Construction Contracts ("Final Report"). See id.* at 14. Counsel contends that this Final Report, published in February, 1993, provides sufficient evidence of discrimination against minority and women business enterprises to justify the set-aside goals set forth in the Casino Control Act.[4]

New Jersey's reliance on the Final Report, however, is misplaced. The Commission that drafted the Final Report was appointed in response to the Supreme Court's decision in *J.A. Croson Co.* and the threat that this decision posed to the continued vitality of certain portions of New Jersey's Small Business Set–Aside Act. *See Final Report* at 1. As amended in 1985, this Act[5] established that state agencies should award at least seven-percent of their contracts to minority business enterprises and three-percent of their contracts to women business enterprises. *See* N.J.S.A. 52:32–21 (West Supp.1999). The goal of the amended Act was to "ensure that a fair portion of the State's total purchases and contracts for construction, property and services is placed with small business, female business and minority business concerns." N.J.S.A. 52:32–18. Consequently, the Commission's mandate was to evaluate discrimination *by the State* against minority and women business enterprises, and the Commission's conclusions concerning discrimination were based on an evaluation of the *State's* purchasing practices. *See Final Report* at i, 1, 7. The Casino Control Act, however, targets discrimination by casino licensees, not the State. As a result, the Commission's report offers little support for the proposition that casino licensees have engaged in discrimination in a way that justifies the set-aside program established by the Casino Control Act. Because this report fails to establish discrimination on the part of casino licensees, the State, in relying on it, has failed to establish a compelling interest in remedying that alleged discrimination. Even if this report provided sufficient evidence of discrimination on the part of casinos, New Jersey would still have to establish that the State was in some way implicated in that discrimination in order to establish that the State has a compelling interest in remedying the discrimination. The Third Circuit has interpreted *J.A. Croson Co.* to mean that "racial discrimination can justify a race-based remedy only if the [State] has somehow participated in or supported that discrimination." *Contractors Ass'n of Eastern Pennsylvania, Inc. v. City of Philadelphia,* 91 F.3d 586, 602(3d Cir.1996) (*Contractors II*). New Jersey has provided no evidence that it has even passively participated in the discrimination it contends the casino industry practices.

Even if New Jersey had a compelling interest, however, the minority set-aside program that the Casino Control Act establishes would still be vulnerable to constitutional attack because it is not narrowly tailored to the compelling interest that New Jersey asserts. Naturally, any attempt to assess the fit between the set-aside program and the discrimination it is alleged to redress is hampered by New Jersey's failure to delimit the extent of that discrimination. Without any measure of discrimination in the casino industry having been made, it is nearly impossible to ascertain whether an across-the-board fifteen-percent set-aside goal is appropriate to remedy that supposed discrimination or whether such a goal is merely arbitrary. *See J.A. Croson Co.,* 488 U.S. at 507, 109 S.Ct. 706. Interestingly, the Commission's report only undermines New Jersey's attempts to shield the set-aside program from constitutional assault on this

---

4. Evidence assembled after the enactment of the Casino Control Act may be considered here. *See Contractors Ass'n of Eastern Pennsylvania, Inc. v. City of Philadelphia,* 6 F.3d 990, 1003–04 (3d Cir.1993) (*Contractors I*).

5. Pursuant to the 1985 amendment, this Act was renamed the "Set–Aside Act for Small Businesses, Female Businesses, and Minority Businesses." N.J.S.A. 52:32:17 (West Supp. 1999).

ground. The Commission concluded that the record of discrimination it established justified a fifteen-percent set-aside goal only in the context of construction contracts and only for minority business enterprises. *See Final Report* at ii. For women business enterprises in the construction context and for both minority and women business enterprises involved in the sale of goods and services unrelated to the construction industry, only a ten-percent set-aside goal was found to be justified. *See id.* Thus, even if the Commission's report were accepted as evidence of discrimination in the casino industry, the remedy established by the Casino Control Act is clearly out of sync with the extent of the discrimination that the Commission uncovered.

There is further evidence that the set-aside program at issue in this case is at best loosely tailored to the State's alleged interest in remedying discrimination in the casino industry. First, there is no evidence in the record that New Jersey attempted race-neutral measures before adopting the minority set-aside program, even though the regulations implementing the Casino Control Act recognize that race-neutral factors such as undercapitalization are at least somewhat responsible for the alleged underrepresentation of minority and women business enterprises among business receiving casino industry contracts. *See* N.J.A.C. 19:53–5.1; *J.A. Croson Co.*, 488 U.S. at 507, 109 S.Ct. 706. Moreover, the set-aside program is overinclusive in several respects. *See J.A. Croson Co.*, 488 U.S. at 506, 109 S.Ct. 706. Under the language of the Casino Control Act and its implementing regulations, for example, casino licensees may satisfy their fifteen-percent set-aside goals through contracts with either minority business enterprises or women business enterprises. *See* N.J.S.A. 5:12–186a; N.J.A.C. 19:53–5.3(c). As a result, it is conceivable that a casino licensee could satisfy its fifteen-percent set-aside goal entirely through con-

tracts with minority business enterprises or entirely through contracts with women business enterprises. Thus, the set-aside program does not differentiate between the discrimination experienced by minority business enterprises and women business enterprises, and allows casino licensees to satisfy the set-aside program's goals in a way that could bestow a windfall of remedial benefit on one group while depriving another group of any such benefit. Such a program is clearly not narrowly tailored.[6]

In addition, the set-aside program is overinclusive as between minority business enterprises. New Jersey has offered no evidence of discrimination against companies run by individuals of Native American, Native Alaskan, Hawaiian, or Portuguese decent. In fact, the Commission's report concludes that evidence of discrimination against such companies does not exist. *See Final Report* at 79. The Casino Control Act and its implementing regulations, however, define individuals of Native American, Native Alaskan, Hawaiian, and Portuguese descent as minorities. N.J.S.A. 5:12–185; 52:32–19g. Consequently, a casino licensee could meet its set-aside goals by contracting with a Hawaiian-owned company even though the only evidence of discrimination in the record clearly states that there is no evidence of discrimination against such businesses. Again, a program that allows such a result is clearly not narrowly tailored.

In sum, the Association has demonstrated a reasonable probability that it will succeed on the merits. The record before me indicates that the set-aside program that is the subject of the Association's Complaint is constitutionally infirm. Presented with insufficient evidence of past or present discrimination by casino licensees in contracting for goods and services, I conclude that the State of New Jersey lacks a compelling interest in remedying the discrimination it claims to exist.

---

**6.** Again, the Commission's report provides little help to the State's cause since it concluded that varying amounts of discrimination against minority business enterprises and women business enterprises justified different set-aside goals.

Moreover, I conclude that the set-aside program is not narrowly tailored to remedy the discrimination that is alleged by the State.[7]

## V. The Association Will Be Irreparably Injured by the Denial of Its Request for a Preliminary Injunction

■ In concluding that the Association's members will suffer irreparable injury if its request for a preliminary injunction is denied, I rely largely on my discussion of standing set forth above. The State asserts that the Third Circuit's decision in *Schurr* should preclude me from finding that the Association's members will suffer irreparable injury if the Association's request for a preliminary injunction is denied. *See* Br. Opp'n Pl.'s Application for Temporary Restraining Order and Preliminary Injunction at 10–12. For reasons already outlined, I find that the *Schurr* case is factually distin-

guishable from this one. This case concerns all facets of contracting for goods and services in the casino industry. The companies that the Association represents compete on an ongoing basis for the casino industry's contracts, and the set-aside program at issue in this case forces them to compete on an unfair playing field in bidding on those contracts. I only add that the case for finding that the Association's members will suffer an immediate irreparable harm is buttressed by my finding that the set-aside program is unconstitutional. Courts have found that " 'an alleged constitutional infringement will often alone constitute irreparable harm.' " *Monterey Mechanical Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir.1997) (quoting *Associated General Contractors v. Coalition for Economic Equity*, 950 F.2d 1401, 1412 (9th Cir.1991)). Consequently, I find that the Association's members will suffer immediate irreparable in-

7. In assessing the constitutionality of the set-aside program to this point, I have applied strict scrutiny, the standard applied to race-based preferences challenged on Equal Protection grounds. I recognize that a different standard, intermediate scrutiny, is applied to gender-based preferences in the set-aside context. *See Contractors I*, 6 F.3d at 1001. Under this standard, "[a] gender preference is valid if it [is] 'substantially related to an important governmental objective.' " *Id.* at 1009. I also recognize that since the Third Circuit's holding in *Contractors I*, the Supreme Court's decision in *United States v. Virginia*, 518 U.S. 515, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996), stating that "[p]arties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action," *see id.* at 531, 116 S.Ct. 2264, has stirred a controversy over whether intermediate scrutiny is now a more rigorous standard than once believed. *See, e.g., Engineering Contractors Ass'n of South Florida, Inc. v. Metropolitan Dade County*, 122 F.3d 895, 907–908 (11th Cir. 1997) (stating that "although the phrase 'exceedingly persuasive justification' has more linguistic verve than conventional descriptions of intermediate scrutiny, it does not necessarily follow that a new constitutional standard for judging gender preferences is embodied in that phrase"); *Cohen v. Brown University*, 101 F.3d 155, 183 n. 22 (indicating that "*Virginia* adds nothing to the analysis of

equal protection challenges to gender-based classifications that has not been part of that analysis since 1979").

I need not assess the effect of the Court's decision in *Virginia*, however, to conclude that the set-aside program at issue in this case fails intermediate scrutiny as well as strict scrutiny. Even when viewed through the lens of intermediate scrutiny, the program fails. The Third Circuit has held that intermediate scrutiny requires the Government to present "probative evidence in support of its stated rationale for the gender preference." *Contractors I*, 6 F.3d at 1010. The State's evidence in this case does not satisfy even this low threshold. The State has defended the set-aside program in part on the ground that it remedies past discrimination against women business enterprises. *See* Br. Opp'n Pl.'s Application for a Temporary Restraining Order and Preliminary Injunction at 13–18. There is no evidence, however, of discrimination against women business enterprises in the casino industry. The Commission's report certainly is not "probative evidence" of such discrimination since its focus is discrimination practiced by state agencies, not discrimination practiced by casino licensees. Consequently, I find that the set-aside program at issue in this case is constitutionally infirm as applied to women business enterprises, as well as to minority business enterprises.

jury from the denial of its request for a preliminary injunction.

## VI. Granting a Preliminary Injunction Will Not Result in Greater Harm to the Defendants and Will Be in the Public Interest

The final two prongs of the legal standard for a preliminary injunction can be easily resolved. The State and the Commission will suffer minimal harm if the Association's request for a preliminary injunction is granted. Certainly, any harm that might be incurred by the State and the Commission will be less than the harm that would be experienced by the members of the Association should the injunction not be granted and should their Equal Protection rights continue to be infringed. Indeed, the members of the Association may even face civil liability for discriminating against businesses on the basis of race and gender pursuant to the provisions of the set-aside act. *See Monterey Mechanical Co.*, 125 F.3d at 708. Finally, the public has a vital interest in not having an unconstitutional statute and regulation enforced, no matter how well-intentioned the statute and the implementing regulations may be.

## VII. Conclusion

For the reasons set forth above, I shall grant the Association's application for a preliminary injunction in part and deny it in part. Specifically, I shall preliminarily enjoin the enforcement of N.J.S.A. §§ 5:12–184 through 5:12–190. I shall not enjoin the enforcement of all of the provisions contained in N.J.A.C. 19:53–1.1 through 19:53–6.12, however, because not all of those provisions are exclusively concerned with the implementation of N.J.S.A. 5:12–184 through 5:12–190. Consequently, I shall enjoin the enforcement of those Administrative Code provisions only to the extent that they implement N.J.S.A. 5:12–184 through 5:12–190.

An appropriate order shall be entered by the Court.

PRELIMINARY INJUNCTION

This matter having come before the Court on Plaintiff's application for a preliminary injunction to enjoin Defendants, State of New Jersey, New Jersey Casino Control Commission, John J. Farmer, Jr., Esq., Attorney General of New Jersey, and James R. Hurley, Chairperson of the New Jersey Consumer Control Commission, from enforcing N.J.S.A. §§ 5:12–184–190 and N.J.A.C. §§ 19:53–1.1–19:53–6.12, Salvatore Perillo, Esq., Perskie, Nehmad & Perillo, P.C., appearing on behalf of Plaintiff, Association for Fairness In Business Inc., John J. Farmer, Jr., Esq., Attorney General, and Mark Turner Homes, Esq., Deputy Attorney General, appearing on behalf of Defendants, State of New Jersey and John J. Farmer, Esq., and John R. Zimmerman, Esq., General Counsel, New Jersey Casino Control Commission, and David C. Missimer, Esq., Assistant General Counsel, appearing on behalf of Defendants, New Jersey Casino Control Commission and James R. Hurley, Chairman of the New Jersey Casino Control Commission; and,

The Court having considered the submissions of the parties, for the reasons set forth in the OPINION filed concurrently with this ORDER;

IT IS, on this 8th day of February, 2000, hereby ORDERED that Plaintiff's application for a preliminary injunction is GRANTED in part and DENIED in part as follows:

1. Defendants are preliminarily enjoined from enforcing N.J.S.A. §§ 5:12–184–190;

2. Defendants are preliminarily enjoined from enforcing N.J.A.C. §§ 19:53–1.1–19:53–6.12 to the extent they implement N.J.S.A. §§ 5:12–184–190;

3. Plaintiff's application for a preliminary injunction is DENIED to the extent that it seeks to enjoin those portions of N.J.A.C. §§ 19:53–1.1–

19:53–6.12 which do not implement N.J.S.A. §§ 5:12–184–190.