**FLORIDA A.G.C. COUNCIL, INC., et al., Plaintiffs,**

v.

**The State of FLORIDA, et al., Defendants.**

**No. 4:03–CV–59–SPM.**

United States District Court, N.D. Florida, Tallahassee Division.

Feb. 6, 2004.

Cathy M Stutin, Fisher & Phillips LLP, Fort Lauderdale, FL, Herbert P Schlanger, Herbert P Schlanger PA, Atlanta, GA, for Plaintiffs.

Craig Ashley Dennis, William T Jackson, Dennis & Bowman PA, Jonathan Alan Glogau, Attorney General State of FL, Tallahassee, FL, for Defendants.

## *ORDER*

MICKLE, District Judge.

PENDING NOW before the Court is the Plaintiffs' Motion for Partial Summary Judgment (doc. 29) and the Defendants' Motion for Summary Judgment (doc. 55). For the reasons set forth below, the Plaintiffs' motion will be granted and the Defendants' motion will be denied.

## I. BACKGROUND

■ The Plaintiffs', Florida A.G.C. Council, Inc., and the South Florida Chapter of the Associated General Contractors, have brought this cause of action challenging the constitutionality of certain provisions of Florida Statutes, § 287.09451 *et seq.* The Plaintiffs contend that aspects of the statute contravene the Equal Protection Clause of the Fourteenth Amendment,[1] by instituting race and gender-con-

---

1. U.S. CONST. amend XIV, § 1 provides:
   No State shall ... deny to any person within its jurisdiction the equal protection of the laws.

scious "preferences" in order to increase the numeric representation of minority business enterprises[2] in certain industries.[3]

According to the statute, the Florida Legislature determined that there existed "evidence of a systemic pattern of past and continuing racial discrimination against minority business enterprises and a disparity in the availability and use of minority business enterprises in the state procurement system." Florida Statutes, § 287.09451(1). In an effort of confront the pervasive problem of racial discrimination, the Legislature "enacted race-conscious and gender-conscious remedial programs to ensure minority participation in the economic life of the state, in state contracts for the purchase of commodities, and in construction contracts." *Id.* To this end, the Office of Supplier Diversity was established within the Department of Management Services to assist minority enterprises become "suppliers of commodities, services, and construction to state government." § 287.09451(2).

The Office of Supplier Diversity (OSD) has a myriad of responsibilities, including, *inter alia,* adopting rules meant to assess whether state agencies have made "good faith efforts" to solicit business from minority business enterprises. § 287.09451(4)(a). The OSD is also empowered to monitor whether contractors doing business with the State have similarly made good faith efforts to comply with the Legislature's objective of greater overall minority participation in the purchasing of commodities, services, and construction contracts. *See* § 287.09451(4)(b). The statute subsequently enumerates targeted measures which contractors should undertake, such as minority-centered recruitment and advertising, as a means of advancing the statute's purposes. *See* § 287.09451(b)(1)-(8).

The Plaintiffs argue that provisions of § 287.09451 impermissibly violate the Equal Protection Clause of the United States Constitution by permitting states agencies to allow the use of race, ethnicity and gender to dictate who receives con-

---

**2.** Florida Statutes § 288.703(2) defines in relevant part a "Minority business enterprise" as:

[A]ny small business concern ... which is organized to engage in commercial transactions, which is domiciled in Florida, and which is at least 51–percent–owned by minority persons who are members of an insular group that is of a particular racial, ethnic, or gender makeup or national origin, which has been subjected historically to disparate treatment due to identification in and with that group resulting in an underrepresentation of commercial enterprises under the group's control, and whose management and daily operations are controlled by such persons. A minority business enterprise may primarily involve the practice of a profession. Ownership by a minority person does not include ownership which is the result of a transfer from a nonminority person to a minority person within a related immediate family group if the combined total net asset value of all

members of such family group exceeds $1 million. For purposes of this subsection, the term "related immediate family group" means one or more children under 16 years of age and a parent of such children or the spouse of such parent residing in the same house or living unit.

**3.** The Plaintiffs have also brought a cause of action pursuant to Title VI. To reiterate what was stated in the undersigned's previous order dismissing many of the Plaintiffs claims, in order to properly bring a Title VI claim, the Plaintiffs "must allege a 'logical nexus' between a federally funded program or activity and the ... discrimination [the Plaintiffs] allegedly suffered." *Commodari v. Long Island University,* 89 F.Supp.2d 353, 378 (E.D.N.Y. 2000), *aff'd,* 62 Fed.Appx. 28 (2nd Cir.2003) (unpublished opinion). As the Plaintiffs have failed to allege a "logical nexus" that would support its Title VI claim, this claim is dismissed. *See Arroyo v. New York State Insurance Department,* 1995 WL 611326 (S.D.N.Y. 1995)

struction and other related contracts. For example, § 287.09451(4)(n)(1) provides that,

> Each [state] agency is encouraged to spend 21 percent of the moneys actually expended for construction contracts, 25 percent of the moneys actually expended for architectural and engineering contracts, 24 percent of the moneys actually expended for commodities, and 50.5 percent of the moneys actually expended for contractual services during the fiscal year ... for the purpose of entering into contracts with certified minority business enterprises as defined in § 288.703(2), or approved joint ventures.

The statute proceeds to list "overall spending goals" for various industry's falling under the authority of § 287.09451. Specifically, state agencies are to allocate 4 percent for black Americans,[4] 6 percent for Hispanic–Americans,[5] and 11 percent for American women[6] of moneys actually expended for construction contracts. § 287.09451(4)(n)(1)(a). For architectural and engineering contracts, state agencies are to allocate 9 percent for Hispanic–Americans, 1 percent for Asian–Americans,[7] and 15 percent for American women. § 287.09451(4)(n)(1)(b). For commodities, the goal is 2 percent for black Americans, 4 percent Hispanic–Americans, 0.5 percent for Asian–Americans, 0.5 percent for Native Americans,[8] and 17 percent for American women. § 287.09451(4)(n)(1)(c). Final-

ly, as it pertains to contractual services, the goals are 6 percent for black Americans, 7 percent for Hispanic–Americans, 1 percent for Asian–Americans, 0.5 percent for Native Americans, and 36 percent for American women of moneys actually expended for contractual services during the previous fiscal year. § 287.09451(4)(n)(1)(d).

The aforementioned spending goals are framed as precatory. The Plaintiffs contend that the goals constitute an impermissible racial and gender classification that cannot withstand constitutional scrutiny. Moreover, the Plaintiffs maintain that the goals serve neither a compelling State interest, nor are they narrowly tailored to warrant their continuation. *See Wygant v. Jackson Board of Education,* 476 U.S. 267, 274, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (1986) (plurality opinion) (racial classifications are only justified by a "compelling governmental interest" and that the means chosen to implement the classifications' purposes must be narrowly tailored to achieve the goal). On this basis, the Plaintiffs have moved for summary judgment.

The Defendants counter that the Plaintiffs are unable to overcome the presumption that § 287.09451 is constitutionally valid. Additionally, the Defendants assert that the Plaintiffs lack standing to seek prospective relief because the Plaintiffs have failed to demonstrate, notwithstand-

---

**4.** Florida Statutes § 288.703(3)(a) defines a black or African Americans as "a person having origins in any racial group of the African diaspora."

**5.** Florida Statutes § 288.703(3)(b) defines a Hispanic American as "a person of Spanish or Portuguese culture with origins In Spain, Portugal, Mexico, South America, Central America, or the Caribbean, regardless of race."

**6.** Florida Statutes § 288.703(3)(e) defines an American woman as a "minority person."

**7.** Florida Statutes § 288.703(3)(c) defines Asian–Americans as any "person having origins In the in any of the original people of the Far East, Southeast Asia, the Indian Subcontinent, or the Pacific Islands including the Hawaiian islands prior to 1778."

**8.** Florida Statutes § 288.703(3)(d) defines Native Americans as any "person who has origins in any of the Indian tribes of North America prior to 1835, upon presentation of proper documentation thereof as established by rule of the Department of Management Services."

ing the explicit terms of § 287.09451 *et seq.*, that race, ethnicity or gender have determined who will be the beneficiary of governmental contracts. The Defendants have similarly moved for summary judgment.

## II. SUMMARY JUDGMENT STANDARD

The standard for summary judgment is well understood. This Court must review all evidence and factual inferences, that are reasonably drawn, in a light that is most favorable to the party opposing summary judgment. *Lowe's Home Centers v. Olin Corp.*, 313 F.3d 1307, 1310 (11th Cir. 2002) (citation omitted). "All reasonable doubt about the facts should be resolved in the favor of the non-movant." *Sledge v. Goodyear Dunlop Tires North America, Ltd.*, 275 F.3d 1014, 1019 (11th Cir.2001) (citations omitted). A party's motion for summary judgment will be granted " if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The moving party has the burden of demonstrating that the there are no genuine issues of material fact in dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In turn, the non-moving party's response "may not rest upon mere allegations or denials of the [moving party's] pleading," but should include affidavits or "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be a sufficient showing that the jury could reasonable find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir.1990).

There of course may be instances where the "parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. If reasonable minds might differ on the inferences arising from undisputed facts; then the court should deny summary judgment." *Clemons v. Dougherty County*, 684 F.2d 1365, 1369 (11th Cir.1982) (citations omitted).

## III. ANALYSIS

### A. Standing

As an initial matter, the Court must determine whether the Plaintiffs have standing to maintain this action. The Supreme Court has squarely addressed this issue, consequently, resolving the question of standing is relatively straightforward. A party seeking to bring a cause of action into a federal district court must first demonstrate an "injury in fact" wherein "a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical" has been invaded. *Northeastern Florida Chapter of the Florida Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656, 663, 113 S.Ct. 2297, 2301–02, 124 L.Ed.2d 586 (1993) (citation and internal quotations omitted). Second, there must be "a causal relationship between the injury and the challenged conduct ... [and] the injury fairly can be traced to the challenged action of the defendant, and has not resulted from the independent action of some third party not before the court." *Id.* (citation and internal quotations omitted). Finally, there must be a "likelihood that the injury will be redressed by a favorable decision ... [wherein] the prospect of obtaining relief from the injury as a result of a favorable ruling is not too speculative." *Id.* at 663–64, 113 S.Ct. at 2302 (citation and internal quotations omitted).

■ The Plaintiffs, who are challenging what they consider to be a State authorized "set-aside" program, are not required to prove that they would have received a particular contract "but for" the State's "spending goals" articulated in § 287.09451(4)(n)(1). In order to establish standing in this context, "a party challenging a set-aside program ... need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis." *Northeastern Florida*, 508 U.S. at 666, 113 S.Ct. at 2303; *see also Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211, 115 S.Ct. 2097, 2105, 132 L.Ed.2d 158 (1995) ("The injury in cases of this kind is that a discriminatory classification prevent[s] the plaintiff from competing on an equal footing.") (alterations in the original). There is no dispute between the parties as to whether the Plaintiffs are ready and able to bid on governmental contracts. The only question at issue is whether the Defendants are maintaining a discriminatory policy that, though benign in purpose, "erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group." *Northeastern Florida*, 508 U.S. at 666, 113 S.Ct. at 2303. This question will be more fully addressed below. However, for the time being, the Court has determined that the Plaintiffs clearly have standing to challenge § 287.09451 *et seq.*

Additionally, it is briefly necessary to touch upon why the Plaintiffs also have standing to pursue prospective relief. The Supreme Court has observed that a party desiring such relief must show "that sometime in the relatively near future it will bid on another Government contract that offers financial incentives to a prime contractor for hiring disadvantaged subcontractors." *Adarand*, 515 U.S. at 211, 115 S.Ct. at 2105. The Plaintiffs have also clearly

satisfied this burden, based on the likelihood that they will bid on State construction contracts in the future, and a plain textual reading of § 287.09451(4)(n)(1)(a)-(d).

## B. Constitutionality of § 287.09451

■ Fifteen years ago, the Supreme Court struck down a city ordinance requiring prime contractors who were awarded contracts by the city of Richmond to subcontract at least 30 percent of the value of the contracts to Minority Business Enterprises. *City of Richmond v. J.A. Croson*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). The Supreme Court noted that while the purposes of the city ordinance were obviously benign, the ordinance nevertheless constituted a racial classification, and thus was inherently suspect. *Id.* at 500, 109 S.Ct. at 725. The *Croson* court found that certain citizens were prevented from competing for a fixed percentage of governmental contracts solely on the basis of their race. Given this, the ordinance was subjected to strict scrutiny, meaning that ordinance's constitutionality rested on whether it was narrowly tailored to further a compelling governmental interest. *See id.* at 493, 109 S.Ct. at 721. The city of Richmond's ordinance was found to violate the Equal Protection Clause, on the grounds that the city had not sufficiently "identified the need for remedial action in the awarding of its public construction contracts." *Id.* at 512, 109 S.Ct. at 731. *Croson* also stands for the proposition that the level of scrutiny that is applied to a particular racial classification is not dependent upon the race of the party aggrieved by the classification. *Id.* at 505, 109 S.Ct. at 727–28; *see also Wygant*, 476 U.S. at 273, 106 S.Ct. at 1846 ("The Court has recognized that the level of scrutiny does not change merely because the challenged classification operates against a group that histori-

cally has not been subject to governmental discrimination.") (citation omitted).

Given this background, the Court must determine whether the spending goals outlined in § 287.09451 are narrowly tailored to further a compelling governmental interest.

### 1. Do § 287.09451 Spending Goals Serve a Compelling Governmental Interest?

■■■ Remedying past or present discrimination is considered to be a compelling governmental interest. *Ensley Branch, N.A.A.C.P. v. Seibels,* 31 F.3d 1548, 1565 (11th Cir.1994). A governmental entity may not rationalize a racial preference of this basis alone. Instead, "the true test of an affirmative action program is usually not the nature of the government's interest, but rather the adequacy of the evidence of discrimination offered to show that interest." *Id.* (quotation omitted). Accordingly, a public employer may justify race-conscious remedial measures if there is a strong evidentiary basis to conclude that such measures are indeed required. *Id.* At this juncture, it is not necessary to scrutinize evidence the Defendants have presented, which for the most part involves affidavits asserting that race does not play a role as to who receives contracting opportunities with the State, and a general assertion that the goals are precatory. The Legislature's articulated reasons for its spending goals, *i.e.,* "a systemic pattern of past and continuing racial discrimination against minority business enterprises and a disparity in the availability and use of minority business enterprises in the state procurement system," § 287.09451(1), would, if true, constitute a compelling governmental interest necessitating race-conscious remedies. *See Croson,* 488 U.S. at 509, 109 S.Ct. at 730 ("Where there is a significant disparity between the number of minority contractors willing and able to perform a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors, an inference of discriminatory exclusion could arise.").

### 2. Are the Spending Goals Narrowly Tailored?

■■■ Determining whether a public employer's race-conscious program is narrowly tailored involves consideration of: (1) the necessity for the relief and the efficacy of alternative measures; (2) the flexibility and duration of the relief, including the availability of waiver provisions; (3) the relationship of numerical goals to the relevant labor market; and (4) the impact of the relief on the rights of innocent third parties.

*Engineering Contractors Association of South Florida, Inc. v. Metropolitan Dade County,* 122 F.3d 895, 927 (11th Cir.1997) (citing *Ensley Branch,* 31 F.3d at 1569 (citations and internal quotation marks omitted)). There is absolutely no evidence in the record to suggest that the Defendants contemplated race-neutral means to accomplish the objectives set forth in § 287.09451 *et seq.,* such as " 'simplification of bidding procedures, relaxation of bonding requirements, and training and financial aid for disadvantaged entrepreneurs of all races [which] would open the public contracting market to all those who have suffered the effects of past discrimination.' " *Engineering Contractors Association,* 122 F.3d at 928 (quoting *Croson,* 488 U.S. at 509–10, 109 S.Ct. at 730). The Plaintiffs have affixed to its Motion for Partial Summary Judgment, Interim Project Report 2001–042 (Report), issued by Florida Senate, outlining the legislative history underlying § 287.09451 and an analysis of disparity studies related to the State's utilization of minority business enterprises. The Report concluded that

there was little evidence to support the spending goals outlined in § 287.09451. In spite of this conclusion however, the Legislature continued to promulgate the statute. This is obviously at variance with Supreme Court's observation that there must be "some showing of prior discrimination by the governmental unit involved before allowing limited use of racial classifications in order to remedy such discrimination." *Wygant,* 476 U.S. at 274, 106 S.Ct. at 1847.

■ The Defendants do not seem to disagree with the Reports findings. Instead, they insist that § 287.09451 is permissive. However, there is no distinction between a statute that is precatory versus one that is compulsory when the challenged statute "induces an employer to hire with an eye toward meeting ... [a] numerical target." *Lutheran Church–Missouri Synod v. Federal Communications Commission,* 141 F.3d 344, 354 (D.C.Cir.1998); *see also Association for Fairness in Business Inc. v. The State of New Jersey,* 82 F.Supp.2d 353, 356 (D.N.J. 2000) ("While the regulations governing the set-aside program do not mandate specific contracting decisions, they undoubtedly have a 'concrete effect' on whether non-minority business enterprises receive contracts[.]"). It is also apparent that the Defendants apply pressure to state agencies to meet the legislative objectives of § 287.09451(1), extending beyond simple outreach efforts. *See MD/DC/DE Broadcasters Association v. Federal Communications Commission,* 236 F.3d 13, 16 (D.C.Cir.2001). State agencies are required to coordinate their minority business enterprise procurement activities with the OSD, which includes adopting a minor-ity business enterprise utilization plan. § 287.09451(6)(a). If the state agency "deviates significantly from its utilization plan in 2 consecutive or 3 out of 5 total fiscal years, the OSD may review any and all solicitation and contract awards of the agency as deemed necessary until such time as the agency meets its utilization plan." § 287.09451(6)(c). Though alleged to be permissive, textually § 287.09451 *et seq.* is not.

■ Accordingly, I find that § 287.09451 *et seq.* is not narrowly tailored to serve a compelling governmental interest, and consequently violates the Equal Protection Clause of the Fourteenth Amendment.[9]

## IV. CONCLUSION

The United States of America has a brutal racial legacy. This is not to suggest that racial discrimination is no longer rampant throughout society. *See Gratz v. Bollinger,* 539 U.S. 244, 123 S.Ct. 2411, 2442—45, 156 L.Ed.2d 257 (2003) (GINS-BURG, J., dissenting) (outlining a litany of racial disparities in health care, educational and employment opportunities, home-buying, and commercial transactions). However, I am bound to follow the precedent established by *Croson* and its progeny. Accordingly, it is hereby

ORDERED AND ADJUDGED:

1. Plaintiffs' Motion for Partial Summary Judgment (doc. 29) is GRANTED.

2. Defendants' Motion for Summary Judgment (doc. 55) is DENIED.

---

9. This order has given short shrift to the gender-conscious aspects of § 287.09451 *et seq.* Gender-conscious affirmative action programs are subjected to intermediate scrutiny. The evidentiary burden in such instances " 'turns on whether there is evidence of past discrimination in the economic sphere at which the affirmative action program is directed.' " *Engineering Contractors Association,* 122 F.3d at 910 (quoting *Ensley Branch,* 31 F.3d at 1581). Even under this more lenient standard, the gender-conscious spending goals outlined in § 287.09451(4)(n)(1) cannot withstand intermediate scrutiny.

3. § 287.09451 *et seq.* is declared unconstitutional.

4. The pretrial conference scheduled for February 9, 2004 is cancelled.

5. The Court will entertain briefing as to proposed remedies, including prospective relief. Such briefing will be due with the Clerk of Court by no later than February 20, 2004.