[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 10, 2001
THOMAS K. KAHN
CLERK

No. 99-15416

D.C. Docket No. 98-01626-CV-NE

CHARLIE SLEDGE,

Plaintiff-Appellant,

versus

GOODYEAR DUNLOP TIRES NORTH AMERICA, LTD.,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Alabama

**(December 10, 2001)**

Before ANDERSON, Chief Judge, TJOFLAT and BIRCH, Circuit Judges.

PER CURIAM:

In this suit for legal and equitable relief under Title VII, 42 U.S.C. § 2000e,

et seq., and 42 U.S.C. § 1981, Charles Sledge, who is black, claims that his

employer, Goodyear Dunlop Tires North America, Ltd. ("Goodyear") refused to

promote him on account of his race. The district court granted Goodyear summary

judgment on the ground that Sledge failed to establish that he was qualified for the

position he was seeking; thus, Goodyear was justified in denying the promotion.[1]

We conclude that the record not only presents a question of fact on that issue, but it

presents a case of intentional discrimination sufficient to take the case to a jury.

We therefore vacate the district court's judgment and remand the case for further

---

[1] In a Title VII case, a person standing in Sledge's shoes makes out a prima facie case, to-wit: a presumption, of racial discrimination by establishing (1) that he belongs to a racial minority; (2) that he is qualified for the position he is seeking and for which his employer is considering applicants; (3) that his employer rejected his application; and (4) after such rejection, the employer either filled the position with a person not of the same racial minority or left the position open. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973); Combs v. Plantation Patterns, 106 F.3d 1519, 1539 n. 11 (11th Cir. 1997). Once the plaintiff establishes a prima facie case, the employer must come forward with a legitimate nondiscriminatory reason for the employment decision. In this case, Goodyear's reason for denying Sledge a promotion was that he failed to pass a prescribed written examination and thus was not qualified for the position he was seeking. As we explain in part II infra, a jury could reasonably find that Sledge was qualified for the position in question and that the examination Goodyear required him to take was a pretext for racial discrimination.

The McDonnell Douglas standard for a prima facie case is applicable in employment discrimination suits brought under 42 U.S.C. § 1981. See Trotter v. Board of Trs. of Univ. of Alabama, 91 F.3d 1449, 1454 (11th Cir. 1996).

2

proceedings.

## I.

### A.[2]

Goodyear operates a tire manufacturing plant in Huntsville, Alabama.  The plant has four business centers, the principal center being the Tire Building Department ("Tire Building").  Charles Sledge worked as a "builder" in that department.  He had been a builder for twenty-three years when he brought this lawsuit.   The machines in Tire Building were serviced and repaired by mechanics from the Maintenance Department ("Maintenance").  Sledge frequently assisted these mechanics in carrying out such tasks; in time, he became so proficient that he often serviced and repaired the machines by himself.

In September 1995, Sledge informed the plant's Human Resources Department ("Human Resources") that he would like to be transferred to Maintenance as a mechanic; the transfer would amount to a promotion. Goodyear's collective bargaining agreement with the union at the plant required that Human Resources place a "Job Opening Notice" sheet on the bulletin board

---

[2] In determining whether the entry of summary judgment was appropriate in this case, we examine the record in the light most favorable to the nonmovant, Sledge.  That is, we resolve all credibility choices in his favor and give him the benefit of every inference a trier of fact could reasonably draw from the evidence presented to the district court.  See Braddy v. Florida Dep't of Labor and Employment Sec., 133 F.3d 797, 799 (11th Cir. 1998).  Subpart A therefore portrays the record in such light.

when a position anywhere in the plant became open.  The sheet would describe the job, the date it became open, and the hourly rate of pay.  Employees who wished to be considered for the position signed the posting.  Human Resources then selected those to be interviewed by the supervisors of the department in which the position was located.  The position was awarded to the person who most impressed the supervisors.

In late 1995, Job Opening Notices appeared on the bulletin board for three mechanic positions in Maintenance.  Sledge signed each sheet.  He was not interviewed.  The positions were filled by white employees, Tim Isbell and Danny Lee on January 15, and Jeff Woodard on January 31, 1996.  At the time Sledge brought this law suit, 107 mechanics were employed in Maintenance, 106 were white and one was black.

In an effort to improve his image at Human Resources, Sledge asked his supervisors in Tire Building to sign a letter stating that he was qualified to be a Maintenance mechanic.  The supervisors did so, and sent the letter to Human Resources in April 1996.

That month, the plant engineer, Edward Grooms, devised a test for determining those to be interviewed to fill a vacancy in Maintenance.  The test had two parts.  The first part, a "written examination" which Human Resources

4

administered, required the applicant to solve mathematics problems and to identify various tools. The second part, the "practical part," which was administered by Maintenance supervisors, required the applicant to repair selected pieces of machinery and demonstrate welding skills. If the applicant made a score of seventy-five percent on the first part and the supervisors approved his repair work, Human Resources would certify the applicant for an interview to be conducted by supervisors in Maintenance.

On May 10 and June 20, 1996, Job Opening Notices for two mechanic positions in Maintenance were placed on the bulletin board. Sledge signed both sheets. Several applicants were tested. Sledge was not; Human Resources denied his request to take the exam. The positions were filled in June and July by two whites who had not taken the test, Randle Shook and Tim Craig.

Sledge protested the decisions awarding these positions to applicants who had not taken the written examination. At the same time, he repeated his request that Human Resources give him a chance to take the test. While his request was pending, another Job Opening Notice appeared on the bulletin board for a mechanic position in Maintenance.[3] Sledge applied for the job, signing the sheet.

---

[3] The record does not indicate the date the posting appeared on the bulletin board. An inference can be drawn from the preceding events and August 7, 1996, when Human Resources finally permitted Sledge to take the test, that the posting occurred in late July.

Several applicants were tested. Sledge was not. The job went to a person who failed the examination, Brian Ramsey, who is white. Thereafter, Sledge's protests to Human Resources continued.

In late July or early August, Grooms altered the first part of the test, expanding the written examination to include a possible 169 points. The revised version consisted of the original questions, with 99 points possible, plus additional questions worth 70 possible points, 30 on drawing/reading questions and 40 on "word problems." The drawing/reading questions required the applicant to glean information from an image on the page and respond to a question regarding the drawing and the word problems were in the form of questions, which called for written answers describing what the applicant would do to solve certain mechanical problems.

On August 5, white applicant Greg Rutherford took the new test with the expanded written examination and the second, practical part, which was still in effect.[4] In administering the first part, Human Resources instructed Rutherford to disregard the pages of the test containing word problems; his examination would be limited to the test as originally administered. He passed the exam (and the

_____

[4] The record does not indicate whether Rutherford took the test before or after applying for a job opening.

practical part as well).  Two days later, at the end of a twelve-hour shift Sledge had begun the previous evening, August 6, Human Resources informed him that, if he wanted to take the test, he would have to take it right then.  Sledge agreed and took the test, both parts.  In administering the first part of the test, Human Resources made him take the entire examination, the original 99 point section plus the drawing/reading portion and the word problems section.  Sledge failed the exam. (He passed the second, practical part, which followed immediately.)  When Human Resources informed him that he had failed the written examination, Sledge asked if he could look at the score sheet and the marks the scorer had made on what he had turned in.  His request was denied.  Had the score sheet been made available to Sledge, he would have learned that had Human Resources disregarded his word problems score, he would have been given a passing grade.[5]

On August 15 and September 12, 1996, more openings for Maintenance mechanic positions were posted.  Sledge applied, but Human Resources, relying on his failing test score of August 7, refused to consider him.

Meanwhile, the union was prosecuting a grievance filed by Charles Slayton, who had applied for a mechanic position in Maintenance but had been rejected because he failed the longer written examination.  The grievance went to

---

[5]  Sledge's attorney learned of this fact during discovery.

arbitration, and the arbitrator found for Slayton; he could retake the test. Slayton is white, and Goodyear was concerned that if it did not let Sledge, a black, take the test anew, it might be faced with a claim of racial discrimination. To avoid such a claim, it had Human Resources test Sledge as well as Slayton.

Human Resources tested both men on October 29, 1996, the same day it placed a Job Opening Notice for a Maintenance mechanic position on the bulletin board. Instead of the extended exam that had replaced the initial 99-point version, Human Resources gave them a brand new test, one designed by David Jacks.[6] Neither man passed. Nonetheless, Slayton got the job.

At this point, Sledge turned to his union for relief. After looking into the situation, the union concluded that, as his supervisors had told Human Resources in April, Sledge was qualified to be a Maintenance mechanic, and it wrote Human Resources to that effect. The union, however, was not willing to take the next step; it would not file a grievance in Sledge's behalf. Sledge therefore turned to the Equal Employment Opportunity Commission, filing the claim that is the subject of this litigation. The Commission took no action, and therefore issued a right to sue letter. After receiving the letter, Sledge brought this suit.

---

[6] The record does not indicate why or when Jacks designed this test. All that we know is that the test administered to Slayton and Sledge was entirely new.

B.

In his complaint, brought under Title VII and 42 U.S.C. § 1981, Sledge

alleges that Goodyear discriminated against him because of his race every time it

rejected his application for a Maintenance mechanic position and, instead, gave the

position to a member of the white race.[7] The complaint is a typical "shotgun"

pleading, in that it does not identify the particular occasion, or occasions, when,

but for Goodyear's intent to discriminate, he would have been promoted.[8] One has

to canvass the record to determine the occasions he actually complains of. Faced

with a shotgun complaint, Goodyear has replied in kind, filing an answer

consisting of little more than generalized statements. Goodyear's answer contains

a general denial: Sledge has never been refused a promotion to Maintenance

mechanic based on his race. The answer also contains eleven affirmative defenses.

Relevant to this appeal are the fourth and tenth defenses. The fourth states that

Goodyear's decisions regarding Sledge were made for "legitimate,

nondiscriminatory reasons." The tenth defense states that "the test given to eligible

---

[7] We refer to Sledge's first amended complaint. It contains two counts. Count one seeks relief under the "disparate treatment" theory of discrimination. Count two seeks relief under the "disparate impact" theory; that is, Goodyear employed a written examination that is not job-related. Rather, it enables Goodyear purposefully to discriminate against blacks who seek mechanic positions in Maintenance.

[8] The failure of the plaintiff to identify his claims with sufficient clarity to enable the defendant to frame a responsible pleading constitutes shotgun pleading. See, e.g., Byrne v. Nezhat, 261 F.3d 1075, 1129-30 (11th Cir. 2001).

employees who want to be employed in [Goodyear's] Maintenance Department is job-related and consistent with business necessity."

Following discovery, Goodyear filed a motion for summary judgment. It focused on the second element of the McDonnell Douglas test, whether Sledge was qualified for the position at issue.[9] Citing Sledge's failure to pass the written examinations he took on August 7 and October 29, 1996, Goodyear contended that Sledge had not shown himself to be qualified for the mechanic position. The district court agreed. In its order granting Goodyear summary judgment, the court stated: "As the plaintiff is unable to establish that he passed either of the maintenance mechanic tests, he cannot establish the second prong of his prima facie case, i.e., that he is qualified to be a maintenance mechanic." This statement indicates that the court limited its consideration to the mechanic positions that were open when Sledge took the August 7 and October 29 examinations. In other words, the court found non-actionable the episodes in June, July, and October 1996, when whites were promoted notwithstanding the fact that they either failed the written examination or did not take it at all.

## II.

We give plenary review to a district court's grant of summary judgment.

---

[9] See supra note 1.

See Burton v. City of Belle Glade, 178 F.3d 1175, 1186 (11th Cir. 1999). "The district court's conclusion[s] of law [are] subject to complete and independent review by this court." In re Sure-Snap Corp., 983 F.2d 1015, 1017 (11th Cir. 1993). A party seeking summary judgment must demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In assessing whether the movant has met its burden, "'the courts should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion'" and "'[a]ll reasonable doubts about the facts should be resolved in favor of the non-movant.'" Burton, 178 F.3d at 1187 (quoting Clemons v. Dougherty County, 684 F.2d 1365, 1368-69 (11th Cir. 1982). We review the district court's orders granting summary judgment in accordance with these familiar standards.

In our view, had the district court focused on the other episodes discussed above, it would have drawn two conclusions: first, that a reasonable jury could find that Sledge was qualified for the Maintenance mechanic position he still seeks; second, that a reasonable jury could find that Goodyear's written examinations – the one Grooms devised in April 1996, the substitute he prescribed approximately three months later, and the examination Jacks devised, and Sledge and Slayton

11

took, in October – were nothing more than a pretext for racial discrimination.[10]

The facts we have set out in part I. A. demonstrate this.

We begin by noting that of the 107 mechanics in Maintenance (albeit when Sledge filed suit), only one is black. When Sledge applied for the three positions that were filled by Isbell, Lee, and Woodard in January 1996, he was not afforded an interview. The record does not indicate why, but the events that followed permit the inference that he was not interviewed because he is black.

Following these January promotions, Sledge immediately set out to make a case for himself. He asked his supervisors to write a letter to Human Resources stating that he was qualified to be a Maintenance mechanic, and they did so. A reasonable jury could find that these supervisors knew what they were talking about. Over a lengthy period of time, they had observed Sledge repair the machinery in Tire Building. These supervisors concluded, a jury could find, that Sledge was just as proficient in repairing and maintaining their machines as were the Maintenance mechanics who serviced their department. Faced with the supervisors' recommendation that Sledge be promoted, a jury could find that the refusal by Human Resources to permit Sledge to take the written examination after

---

[10] Thus, on the record as it now stands, Sledge does not need the benefit of a McDonnell Douglas presumption; rather, a jury could reasonably infer that he has been denied the promotion he seeks because of his race.

12

he signed the sheets for the job openings posted on May 10 and June 20 was racially motivated. That is, what possible nondiscriminatory motive could Human Resources have had for certifying for interview two men, Shook and Craig, who had not taken the written examination, an examination the plant manager had instituted? Could not a jury find that the written examination was not job-related, that it was merely a pretext for racial discrimination, when Shook and Craig got the jobs?

What transpired later reinforces the notion that the examination was mere pretext. After Shook and Craig were promoted, Ramsey stood for the exam and failed. Yet, Human Resources certified him for interview by Maintenance supervisors, and they selected him. These supervisors again did not interview Sledge because Human Resources would not permit him to take the examination. Could not a jury find that Human Resources' goal was to ensure that no black would become a Maintenance mechanic? We think so.

Perhaps the most telling piece of evidence indicating that one need not pass the written examination to become a Maintenance mechanic is the fact that Slayton was awarded the position even though he failed the exam. He failed not once, but twice.

III.

In conclusion, the evidence of racial discrimination in this case is compelling. When the record is examined in the light most favorable to the nonmovant, Sledge, one must conclude that not only has he satisfied the McDonnell Douglas criteria for a prima facie case, he has created a fact issue as to whether Goodyear's reason for denying him the position he seeks – that he twice failed a written examination – is a pretext for racial discrimination. Accordingly, the district court's judgment is VACATED and the case is REMANDED for further proceedings.

SO ORDERED.