[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
February 19, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-12242
Non-Argument Calendar

_____

D. C. Docket No. 06-00273-CV-T-24-MAP

MONTICELLO AUSTIN,

Plaintiff-Appellant,

versus

PROGRESSIVE RSC, INC,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(February 19, 2008)**

Before TJOFLAT, BIRCH  and BLACK, Circuit Judges.

PER CURIAM:

Monticello Austin appeals the district court's grant of summary judgment in

favor of Progessive RSC ("Progressive") as to his employment discrimination claims brought pursuant to 42 U.S.C. § 1981 and the Florida Civil Rights Act ("FCRA"), Fla. Stat. Ann. §§ 760.01-760.11. Austin argues that the district court erred in finding that he had failed to establish a prima facie case of discrimination and in alternatively finding that he had failed to raise a genuine issue of material fact as to whether Progressive's legitimate, nondiscriminatory reasons for not promoting him might be pretextual. We AFFIRM.

## I. BACKGROUND

Austin, a black male proceeding through counsel, is employed by Progressive, a property and casualty insurance company with over 27,000 employees nationwide. He was hired in 1997 as a Client Server Operations Analyst ("CSOA") II at the Riverview, Florida facility to work as part of the IT Business Group's Enterprise Technology Call Center Desktop Support Group. His work unit consisted of about 11 employees who provide technical computer support of employees at Progressive's Sales and Service call center in Riverview. Austin was hired by Al Vitello, the IT Manager at the time, and, since 1998, has worked for IT Managers Eric Gruhn, Eric Wilson, Brian Clapper, and Javier Vinces. Each of these IT Managers reported to Perry Hubert at Progressive's Austin, Texas facility. The work unit is currently divided into three separate areas:

2

Problem Management (trouble ticket resolution), where Austin works under Team Lead Dave Peck; Asset Management (computer configuration and asset control), where Bill Honecker is Team Lead; and Infrastructure (server and telecom equipment maintenance). There are also call center support units in Phoenix, Sacramento, Colorado Springs, Cleveland, and Austin, each with its own IT Manager.

Austin initially filed his complaint against Progressive in Florida state court. He sought compensatory damages, including lost pay, and an injunction ordering Progressive to promote him to the position of Client Server Operations Analyst ("CSOA") III. He alleged that when he had been hired as a CSOA II, he had been promised that he would be promoted to the position of CSOA III within the year. Austin further alleged that he had made repeated requests for the promised promotion from 1999 through 2005, but had been refused. According to Austin, he was the only black employee in his work unit, and his race was a determining factor in Progressive's decision not to promote him. Austin also alleged that he had been the only employee in his work unit not to have received a salary grade increase.[1]

---

[1] Austin moved to his amend his complaint to include a retaliation claim under the FCRA based on his discovery that his employment file contained unwarranted disciplinary documents. Progressive opposed the motion, and the district court denied it, finding undue delay and that the proposed amendment was futile.

The parties do not dispute that a promotion from CSOA II to CSOA III requires an employee to demonstrate to the satisfaction of his or her manager consistent performance of level III work in the course of daily duties. The levels of performance associated with each job level are set forth in a Job Skills Matrix which Progressive has used since the early 1990s in evaluating employees for progression or promotion.[2]

Some of the skills an IT Manager looks for in evaluating a CSOA II for promotion are: the ability to create work instructions and procedures for lower level technicians; the ability to accept feed back and coaching from senior managers; the ability to handle multiple projects at one time; and a demonstrated ability "to enthusiastically complete the job at the highest standard, beyond just the acceptable limits." R-Exh. 25-8 ¶ 5-6; Id. 25-7 at 23. An employee seeking promotion to CSOA III must also demonstrate strong troubleshooting skills, effective communication and leadership skills, and established expertise within the group for a particular business process. According to Progressive, an employee will not be promoted unless that employee's work unit has a business need for a

_____

[2]Austin asserts that Vinces admitted that, before 2005, no other employees were required to submit Matrices as part of evaluation for promotion. In fact, Vinces and Reed both testified that matrices were consistently used – though they were not mandatory – in the evaluation process through 2003, and that they have been required for evaluation since the beginning of 2004, on an annual basis, regardless of whether a promotion is sought. See R1-30 at 40; R-Exh. 25-2 ¶¶ 6, 8; Id. 25-8 ¶ 9.

4

CSOA III.[3]  More specifically, "a determination has to be made that the technical support requirements of the facility and the needs of the team in place at the facility justify the hiring or promotion of an individual to the next level."  R-Exh. 25-2 ¶ 7; Id. 25-3 at 22-25; Id. 25-8 ¶ 7.  In determining business need, Progressive considers technical support problems handled by the technician employee at the facility, the technical expertise of other employees in the work unit, and whether the employee has invested the time to evaluate, analyze and improve upon team processes so as to create a need for someone at the next level.  Once the IT Manager and employee agree that the employee is performing at the relevant level, and management has determined that the facility has a business need for an employee at that level, then the IT Manager may recommend the employee for promotion.  In Austin's case, such a recommendation would have been made to Perry Hubert.

From 1998 through the time Austin filed his claims, no employee at Riverview has been designated CSOA III.  Five promotions from CSOA I to II, and the promotion of Vinces from CSOA IV to IT Manager were the only

---

[3]Although Austin alleges that Reed and Vinces both testified that business need was not a factor considered in making promotions to CSOA III, that is not the case.  Vinces's testimony explains his understanding that the existence of an employee performing at CSOA III on a daily basis would indicate a business need for a level III position (but that this would require the facility to have a daily need for the performance of level III duties).  R1-30 at 47-48.  Reeds deposition testimony also clearly acknowledges that "business need" is a factor.  See R-Exh. 29-7 at 14.

promotions made. Austin alleges that he is the only member of his unit not to have been promoted a level. However, neither Bill Honecker (CSOA IV) or Derick Sookhoo (CSOA V), each of whom is currently employed in that unit, has been promoted either. David Peck (CSOA IV), although he was promoted while working at Progressive's Cleveland facility, has not been promoted since coming to Riverview.

Progressive's Human Resources Consultant for the IT Business Group, Darren Reed, testified that his first contact with Austin had been in January 2004, in connection with Austin's complaint that he had not been promoted due to his race. Reed had informed Austin that no promotions to Level III had occurred in Riverview's ETG group, noted that Austin had not completed a Matrix, and determined that there had been no discrimination. He also investigated Austin's subsequent internal complaint of discrimination and approximately 30 calls over the next two years and found each to be wanting. In investigating the initial complaint, Reed had reviewed Austin's performance evaluations, spoken with his supervisor, and found that Austin had not merited promotion because he had performed below expectations or merely met expectations, instead of exceeding them. Beginning in 1997, Austin had received several negative performance reviews from different supervisors. Although Austin's job had been reclassified in

6

July 2002 as a PC Technician position because of changes in federal regulations, the jobs of sixteen other employees (15 white and 1 African-American) had also been reclassified, Austin had been paid retroactive overtime and had suffered no loss of salary, and Austin was placed in another CSOA II position by June 2005 (6 months after his request for that action). According to Reed, Austin filed two charges of race discrimination with the EEOC based on the reclassification and failure to promote, each of which resulted in a "No-Cause" determination. R-Exh. 25-2 ¶¶ 24-25. He filed a third charge in January 2007 which was pending during discovery in this case.[4]

Progressive's IT Group Manager, Perry Hubert, testified that he had first learned about Austin's concerns regarding his not having been promoted from Brian Clapper, to whom Vinces reported. According to Hubert, both Clapper and Vinces believed that Austin did not meet the requirements for a CSOA III because Austin lacked initiative, leadership, and job skills. Hubert stated that a CSOA III is

---

[4]Attached to Reed's affidavit were: (1) a list of the members of Austin's work unit, their races, and relevant promotions; (2) the job descriptions for the CSOA II and III positions; (3) a presentation entitled "The Job Matrix Process," which, among other things, indicated that a promotion could not occur before an employee submitted a complete matrix; (4) Austin's performance reviews and a written warning; (5) an e-mail sent by Austin, suggesting that he had not been promoted due to his race; (6) notes from an interview of Austin by Reed regarding an e-mail in which Austin had been informed that completing a job matrix was a mandatory condition for promotion; (7) a skills evaluation completed by Austin; (8) a call center report stemming from a complaint made by Austin; and (9) two EEOC "no cause" determination notifications.

essentially the "go-to person" for the team and the "local expert" with respect to technical skills. R-Exh. 25-7 at 23. Hubert emphasized that even if an employee and manager agree that a promotion to CSOA III is justified, a business need must still exist. A high-level manager determines whether a business need exists at a particular call center. Hubert also testified that a black CSOA III worked in Colorado Springs and had been promoted before Austin had raised his concerns about not being promoted.

Javier Vinces averred that he had first been assigned as Austin's mentor in 2001 because of customer service problems. In 2002, Vinces became Riverview Team Lead, and in August 2004, he was made Riverview's IT Manager. Vinces explained that, although Austin had received "an overall "Meets Expectations" rating in each of 2004 and 2005, he had not consistently met core objectives, failing to meet his Service Center Ticket objective, for example, in 2004, and failing to meet the Service Level Agreement percentage in 2005. R-Exh. 25-8 ¶¶ 11-12. Austin was also consistently rated at the bottom of his four-person work group. Furthermore, he had failed to complete the requisite Matrix evaluation.

Vinces also explained why Austin had been considered but not selected for transfer to the Sabal Park facility in 2002. Originally, Vinces had been scheduled to move to Sabal Park as well. But, because of personnel changes above him

8

which would have left Riverview unsupervised, Vinces's move was cancelled. "This impacted the abillity of [Austin] to be able to support Sabal Park on his own." Id. ¶ 16. Vinces averred that a more "well-rounded" employee who "could work more independently" had then been selected for transfer. Id. ¶ 17. Finally, Vinces explained that, after Austin had been reclassified as a PC Tech II, he had refused to move Austin from level II to a PC Tech III position because Austin had not been qualified.[5] He explained that he had created "good" and "bad" memos to document significant actions of team members and that Austin had more "bad" memos than any other team member and also had nearly five times as many "bad" memos as "good" ones. R1-30 at 28-31. Furthermore, Austin had been placed under increased scrutiny for a period of time because of customer complaints.

William Honecker testified that he had worked as a Level II or III before leaving Progressive in 1995 and had been rehired in 1996 at Level IV. He stated that he had not received a promotion since that time. Dave Peck testified that he had been hired as a Level II and promoted to Level III in Ohio and had been transferred to Level IV Team Lead at Riverview in 2001. Peck explained that he had received the promotion from Level II to Level III while in Cleveland because

---

[5]Attached to Vinces's affidavit were: (1) a description of the positions within the CSOA Job Family; (2) Austin's 2004 and 2005 performance evaluations; (3) a productivity improvement plan from 2006; (4) charts and graphs from 2005 and 2006 comparing Austin's performance to that of his coworkers; and (5) skills evaluations.

he had worked for Progressive's CEO, CFO, and CIO and had had the opportunity "to do things above and beyond and get recognized for it." R-Exh. 25-15 at 7. Peck also noted that Andy Dawkins had been promoted from CSOA I to II in 2005. Peck had informed Vinces that Austin was performing satisfactorily as a Level II, but that he needed to work on customer interaction and technical matters. Peck also described Austin as having reacted negatively when problems were brought to his attention. According to Peck, he never specifically discussed with Vinces whether Austin was ready to be promoted, although he later testified that on one occasion he had told Vinces that Austin was not ready.[6] Peck added that other team members were more qualified to be a CSOA III if the position had become available.

Former IT Manager, Brian Clapper, stated that he had been Austin's IT Manager from May 2002 until August 2004. In July 2002, Austin had assumed a new role, which involved configuration and asset management of computers and less customer contact. When Austin requested a promotion to CSOA III, Clapper explained to him that his job duties mapped only to Level I and II on the Matrix. He also informed Austin that promotion opportunities were better at Progressive's

_____

[6]Although Austin asserts that Peck testified that he told Vinces that Austin was ready to be promoted, the passage Austin has quoted in his brief fails to support that assertion. A careful reading reveals that the question to which Peck replied, "[O]verall, yes, he was," concerned whether Austin was "performing his duty in []his [current] role." R-Exh. 25-15 at 14.

10

Cleveland facility.  Austin had no interest in moving to Cleveland and refused to complete a Matrix.  Clapper rated Austin as meeting expectations and performing at Level II for 2002 and 2003 and denied that Austin's race had any effect on his evaluation.

Austin testified that he had expected to be promoted to CSOA III at the time of his first performance evaluation in 1998 based on an understanding with Vitello. According to Austin, he had a "gut[] feeling" that Progressive had failed to promote him due to race discrimination, although he lacked specific proof thereof. R-Exh. 25-11 at 6.  Vitello had been succeeded by Gruhn, whom Austin described as engaging in "preferential treatment," though not race discrimination. Id. at 7. Austin also accused Hubert of engaging in race discrimination, explaining that he blamed Hubert because "[a]ll the other players ha[d] changed," although he conceded that he lacked specific evidence of racial bias. Id. at 14-15.  Austin criticized Progressive's objective criteria for promotion as irrational, complaining that associated minimum performance levels were chosen at random and that advancement to a higher position on the Matrix required meeting the performance levels associated with that position.  Nevertheless, he conceded that all work group employees faced the same barrier.

Austin acknowledged that no CSOA III promotions had occurred at Riverview, but stated that white employees had received other promotions. Austin contended that he had performed Level IV and V work for previous employers. He also asserted that he was performing Level III work in May 2002, and that he had performed analysis, problem solving, and troubleshooting at Level III, but he was unable to provide specific examples. Additionally, he stated that his technical knowledge was a Level III or IV "[b]ecause [he] believe[d] it," but, again, he could not provide specific examples. R-Exh. 25-12 at 24. He indicated that he had recommended technology solutions for Progressive and contended that he was a Level IV in terms of initiative and leadership because he had been a leader before starting at Progressive. Austin acknowledged that he was not deemed an "expert" in a particular area of his job and that he had not "done anything in the[] Matrix." R-Exh. 25-13 at 3, 11.

Austin further testified that he had been passed over when projects were assigned and that his requests for flexible hours had been denied even though other employees were allowed such schedules. He also contended that although, as far as he knew, none of his coworkers – including white employees – had received a rating higher than "meets expectations," they had been promoted. R-Exh. 29-2 at 56-57. According to Austin, he had submitted a Matrix in April 2006 and had been

12

instructed by Vinces to remove certain entries he had made that were designated as Level III work.

In its motion for summary judgment, Progressive argued that Austin could not establish a prima facie case of discriminatory failure to promote under § 1981 or the FCRA for several reasons. First, a CSOA III position did not exist at the Riverview facility, and the absence of an available position was fatal to Austin's claim. Second, Austin had presented no evidence of racial bias and had merely disagreed with how Progressive set its objective performance standards. Third, to the extent that CSOA III was a non-competitive or accretion promotion, Austin had failed to demonstrate that he was qualified for the position and that similarly situated employees had been promoted to that position. Progressive also argued that even if Austin could have established a prima facie case, he could not establish that its legitimate reasons for not promoting him – namely, that no business need existed for a CSOA III at Riverview and that he was not qualified – were pretextual. Finally, Progressive contended that Austin's § 1981 and FCRA claims were time-barred to the extent that they involved allegations of failure to promote from before January 2002.

Austin responded, reiterating much of his deposition testimony and adding that: (1) Vinces had begun placing unwarranted disciplinary memoranda in his

13

personnel file the day Austin had expressed concerns about race discrimination; (2) Vinces had asked others to monitor him after his transfer to the configuration room; (3) because the Riverview facility was Progressive's second largest after Cleveland, the advice to consider a transfer to Cleveland was "nothing more than further [race] discrimination and harassment," R1-28 at 5 n.8; (4) he had completed a Matrix but had been ordered to remove all entries that could be considered evidence of Level III work; (5) he had volunteered for many projects, but had often been turned down; (6) his requests for additional training had been refused; (7) a business need depended solely on an employee's performance; and (8) he was the only CSOA nationwide who had not received a promotion upon request.

Austin contended that, on this basis, he had established a prima facie case. He also asserted that even if Progressive's reasons for failing to promote him were deemed legitimate and non-discriminatory, they were pretextual because, although he presented only one allegation of failure to promote, other forms of discriminatory bias existed. He pointed out, for example, that no employees had been promoted to CSOA III while Austin was employed at Riverview and that a jury could find that this was caused by Austin's complaints regarding failure to promote him. Although he conceded that he had not brought a claim based upon a pattern or practice of discrimination, Austin asserted that the absence of a single

14

black lead or manager in the IT Department nationwide for approximately ten years was evidence of pretext. Finally, he cited as evidence of pretext the failed transfer to Sabal Park, a denial of his request for an alternative work schedule, the reclassification of his job, and being told to consider a position in Cleveland.[7]

The district court granted Progressive's motion for summary judgment.[8] First, the court found that Austin had failed to present any direct evidence of discrimination. Second, the court found that he had failed to place his statistics on Progressive's hiring of African-American IT Leads and other employees within any context which would lend them probative value as to a pattern of discrimination. Third, although the court concluded, for the purposes of summary judgment, that the lack of a CSOA III position at Riverview was not fatal to Austin's claim, it nevertheless found that he had failed to establish that he was

---

[7]Progressive challenged Austin's response on the ground that it contained misstatements of fact, noting that: (1) Vinces had also requested that employees observe Austin's successor in the configuration room; (2) Vinces had been asked to monitor Austin because of customer complaints; (3) Peck had never told his supervisor that Austin was ready for promotion to CSOA III; and (4) Austin had had disciplinary action taken against him. Austin then filed an amended memorandum of law in opposition to Progressive's motion for summary judgment, conceding that he had been subject to disciplinary action, but noting that it had not been significant.

[8] The district court found that Austin's claims under 42 U.S.C. § 1981, in particular, were subject to a four-year statute of limitations and that only those events occurring between January 2002 and the filing of the complaint in January 2006 would be considered; all earlier claims of racial discrimination were disposed of via summary judgment. Because Austin did not address this in his brief, he has abandoned any challenge to the district court's grant of summary judgment regarding the pre-2002 portions of his claims. See Access Now, Inc. v. Southwest Airlines Co., 385 F.3d 1324, 1330 (11th Cir. 2004) (noting that a legal claim or argument that has not been briefed will be deemed abandoned).

15

qualified to be a CSOA III. The court rejected Austin's argument that Progressive utilized a completely subjective evaluation and promotion process, and found that Austin had presented only his own opinions regarding his qualifications. Furthermore, the court found that Progressive had presented substantial evidence of Austin's lack of qualifications, including that none of his supervisors recommended that he be promoted and that none of Austin's job duties mapped to a CSOA III on the Matrix. Finally, the court pointed out that Austin had failed to identify a single similarly situated coworker who had been promoted to CSOA III.

The court further found that, even if Austin had established a prima facie case, Progressive had presented legitimate, non-discriminatory reasons for not promoting him – i.e., that no business need existed for a CSOA III at Riverview and that Austin did not meet the criteria for a CSOA III – and that Austin had failed to raise a genuine issue of material fact as to whether these reasons might be pretextual. The court also determined that Progressive's decisions to transfer a different employee to Sabal Park and to reclassify the jobs of Austin and other employees who performed configuration duties were legitimate business decisions that did not refute Progressive's proffered non-discriminatory reasons for not promoting Austin. Accordingly, the court granted Progressive summary judgment on Austin's § 1981 and FCRA claims. Austin timely appealed.

16

## II. DISCUSSION

We review a district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the non-moving party. Skrtich v. Thornton, 280 F.3d 1295, 1299 (11th Cir. 2002). "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Eberhardt v. Waters, 901 F.2d 1578, 1580 (11th Cir. 1990) (quoting Fed. R. Civ. P. 56(c)).

Title 42 U.S.C. § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State . . . to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ." Title VII makes it illegal for an employer "to fail or refuse to hire . . . any individual . . . because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). Claims of discrimination under § 1981 and the FCRA are analyzed in the same manner as those brought under Title VII. See Turnes v. AmSouth Bank, NA, 36 F.3d 1057, 1060 (11th Cir. 1994); Bass v. Bd. of County Comm'rs, 256 F.3d 1095, 1109 n.4 (11th Cir. 2001).

17

Because Austin relied on circumstantial evidence, the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973), and Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089 (1981), applies to his race discrimination claims. See Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc) (discussing an ADEA claim). Under that framework, if a plaintiff establishes a prima facie case of discrimination, the employer must rebut that presumption by articulating a legitimate, nondiscriminatory reason for not promoting him. Carter v. Three Springs Residential Treatment, 132 F.3d 635, 642-43 (11th Cir. 1998). If the employer does so, the plaintiff is left with the burden of demonstrating that the employer's offered reasons are pretextual. Chapman, 229 F.3d at 1024-25.

A plaintiff may establish a prima facie case of discriminatory failure to promote by showing that "(1) []he is a member of a protected class; (2) []he was qualified and applied for the promotion; (3) []he was rejected despite [his] qualifications; and (4) other equally or less qualified employees who were not members of the protected class were promoted." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1089 (11th Cir. 2004). "This formula must not be applied mechanically, but flexibly, with a view toward the particular . . . procedures and factual situation presented." Phillips v. Joint Legislative Comm. on Performance

18

and Expenditure Review of the State of Miss., 637 F.2d 1014, 1027 (5th Cir. Feb. 1981) (discussing the McDonnell Douglas test in the context of failure to hire).

The fourth prong of the test may also be satisfied if the position was left open despite a plaintiff's proven qualification, or where a similarly situated employee outside the plaintiff's classification received the promotion instead. Sledge v. Goodyear Dunlop Tires N. Am., Ltd., 275 F.3d 1014, 1015 n.1 (11th Cir. 2001) (per curiam). A similarly situated employee "must be similarly situated 'in all relevant respects.'" See Wilson, 376 F.3d at 1091 (quoting Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (per curiam)).

We have held that an employer's subjective evaluations of an employee cannot be used to defeat a plaintiff's prima facie case that he was qualified for the job. Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 768-69 (11th Cir. 2005) (per curiam). In so holding, we reaffirmed that, to prove he was qualified, a plaintiff must demonstrate only that he met the employer's objective qualifications. Id. at 769. However, a plaintiff's opinion that he was qualified for promotion, without more, is insufficient to establish that fact. Cooper v. Southern Co., 390 F.3d 695, 743 (11th Cir. 2004) (noting that the plaintiff's managers maintained that she was an average employee who did not meet and exceed the expectations of her job).

19

A reason is not "a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515, 113 S.Ct. 2742, 2752 (1993) (quotation and emphasis omitted). In attempting to demonstrate pretext, a plaintiff may not "recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer." Chapman, 229 F.3d at 1030. If the proffered reason "might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." Id.

Evidence before the district court established that Austin is a member of a protected class. Because Progressive utilized objective criteria, in the relevant time period between January 2002 and the filing of the complaint in January 2006, in determining whether Austin was qualified for promotion, Austin had to establish that he was qualified for a promotion to CSOA III. Cf. Vessels, 408 F.3d at 768-69. However, the only evidence presented by Austin to demonstrate that he was qualified for promotion consisted of his own opinion, which is insufficient without more. See Cooper, 390 F.3d at 743.

Although he contends on appeal that his performance evaluations, work assignments, and various depositions show that he was qualified, his performance

20

evaluations indicate that, at best, he met expectations for the Level II position he already occupied. Additionally, his supervisor testified that he was not ready to become a CSOA III (or Level III) even if a business need existed. Finally, Austin himself conceded that he had not done "anything" in terms of the objective criteria and was not an "expert" in any particular areas of his job. R-Exh. 25-13 at 3, 11. Accordingly, he did not demonstrate that he was qualified and thus failed to establish a prima facie case of discriminatory failure to promote on that basis.

Even assuming, <u>arguendo</u>, that Austin had established that he was qualified for promotion and that he had been rejected, he presented no evidence of similarly situated coworkers who were promoted. Progressive never used a CSOA III at the Riverview facility where Austin worked during the course of his employment and, therefore, no employees were similarly situated in that respect. Although Austin argues that every employee eligible for a promotion received one, none of these employees were promoted to CSOA III and, thus, none were similarly situated. <u>See</u> <u>Wilson</u>, 376 F.3d at 1091. Even if an employee need not have been promoted to CSOA III to be similarly situated, Austin presented no evidence of the qualifications of any employees who were promoted to other positions. Accordingly, Austin failed to demonstrate that a similarly situated coworker was

21

promoted or treated more favorably and, thus, did not establish a prima facie case on that basis.

Finally, even assuming, arguendo, that Austin had established a prima facie case of discriminatory failure to promote, the district court still did not err in granting summary judgment because Austin failed to raise a genuine issue of material fact as to whether Progressive's reasons for not promoting Austin might have been pretextual.[9] Austin implicitly contends that Progressive's reasons for not promoting him were illegitimate because Progressive did not use objective criteria in evaluating him for promotion. However, Austin was evaluated against several objective measures. Additionally, the only evidence he has presented of his qualification for a level III position consists of his own opinion, which, standing alone, is insufficient. See Cooper, 390 F.3d at 743. All other evidence shows, instead, that his managers believed him to be unqualified. Neither has he presented

---

[9]The transfer of another employee instead of Austin to Sabal Park was a lateral move rather than a promotion and so does not go to Austin's failure to promote claim. However, even if it did establish a prima facie case of failure to promote, Austin has failed to show that Progressive's reason – that the employee was more qualified to be there without a manager – was pretextual.

In the promotion context, the Supreme Court has held that qualifications evidence may show that an employer's proffered reasons for non-promotion were pretextual. Ash v. Tyson Foods, Inc., 546 U.S. 454, 457, 126 S. Ct. 1195, 1197 (2006), cert. denied, __ U.S. __, 127 S.Ct. 1154 (2007). Since Ash, we have held that "[a] plaintiff must show that the disparities between the successful applicant's and [his] own qualifications were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." Brooks v. County Comm'n of Jefferson County, Ala., 446 F.3d 1160, 1163 (11th Cir. 2006) (quotation omitted). Austin has not asserted that he was more qualified than the transferred employee, nor has he presented any evidence of her qualifications.

22

any evidence that there was, in fact, a business need for a level III CSOA at Riverview. Accordingly, he has failed to meet Progressive's proffered reasons – lack of qualifications and no business need – head on and rebut them, thereby precluding him from establishing pretext. See Chapman, 229 F.3d at 1030.

### III. CONCLUSION

Austin appeals the district court's grant of summary judgment in favor of Progressive as to his employment discrimination claims. Because Austin has failed to establish a prima facie case of discriminatory failure to promote and because, even if he had done so, he has failed to raise a genuine issue of material fact as to whether Progressive's legitimate, nondiscriminatory reasons for not promoting him might have been pretextual, we **AFFIRM**.

**AFFIRMED.**